UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

THOMAS JOHN BOUKAMP,

     Defendant.

No. 5:20-CR-165-H

## MEMORANDUM OPINION AND ORDER

The Court recently held a hearing to determine whether Thomas John Boukamp was competent to stand trial. Based on the evidence, testimony, argument, and the Court's observations of the defendant, the Court found Boukamp competent to stand trial. Dkt. Nos. 121; 123. Both the government and defense presented expert testimony on the issue. The government's expert—an experienced forensic psychologist who has conducted over 30 competency evaluations—testified credibly that Boukamp was competent to stand trial. Two of the defense's testifying experts were not forensic psychologists nor trained to give opinions on competency. One of those experts, Dr. Montfort, admitted her lack of qualifications on the subject, and the other, Dr. Garcia, admitted that this was her first competency evaluation. Thus, Dr. Garcia recommended that someone with forensic training conduct an additional evaluation. The defense's third expert, Dr. Kellaher, has forensic training, but the Court disagrees with her opinion on competence for the reasons detailed below. The Court issues this Memorandum Opinion and Order, detailing its findings in support of its Order on Mental Competency (Dkt. No. 123). For the reasons stated below, the Court finds by a preponderance of the evidence that the defendant is competent to stand trial.

1.      **Procedural History and Factual Background**

   A.      **Procedural History**

   On December 9, 2020, Boukamp was initially charged in a five-count indictment

charging him with (1) Transportation of a Minor with Intent to Engage in Criminal Sexual

Conduct; (2) Travel with Intent to Engage in Illicit Sexual Conduct; (3) Enticement of a

Minor; (4) Receipt of Child Pornography; and (5) Cyber Stalking.  Dkt. No. 6.  On July 14,

2021, the government filed a five-count superseding indictment that was substantially the

same but added Attempted Enticement of a Minor to the preexisting Count 3.  Dkt. No. 37.

And on October 13, 2021, a second superseding indictment issued, adding eleven new

counts: (6) Receipt of Child Pornography and (7)–(16) Production and Attempted

Production of Child Pornography.  Dkt. No. 89.

   Trial in this case was originally set for May 10, 2021.  Dkt. No. 14.  The Court

granted the defendant's first requested trial continuance in April 2021.  Dkt. No. 16.

Following a second motion for continuance to permit the defendant to obtain a psychiatric

evaluation (Dkt. No. 17), the Court continued trial to August 2, 2021 (Dkt. No. 18) and

then to August 9 (Dkt. No. 35).  On the Thursday before trial, defense counsel filed a

motion for a competency hearing (Dkt. No. 78), and the government filed a motion for a

competency evaluation the next day (Dkt. No. 84).  Based on the parties' agreement that a

competency examination was warranted, the Court granted the motion and vacated the trial

setting.  Dkt. Nos. 86; 87.

   The Court initially set a competency hearing for March 10, 2022 (Dkt. No. 96), but,

in light of defendant's concerns about travel arrangements for experts and additional

psychiatric evaluations, the Court continued the competency hearing to May 3 (Dkt. No.

100).  On the Thursday before the hearing, defense counsel moved to continue the hearing

again (Dkt. No. 116), but the Court denied continuance, finding no meritorious grounds to do so (Dkt. No. 118).

On May 3, the Court conducted an approximately six-hour competency hearing during which it considered the parties' exhibits and heard testimony from the parties' experts as well as arguments from both sides.  Dkt. No. 121.  Based on evidence, testimony, argument, and the Court's observations of the defendant during the hearing, the Court found Boukamp competent to stand trial.  Dkt. No. 123.

### B.   Factual Background

This case involves allegations that Boukamp corresponded with a 14-year-old victim, Jane Doe, who lives in Texas; drove Doe from Texas to Michigan; and engaged in various illicit sexual conduct with her.  *See* Dkt. No. 89 (Second Superseding Indictment). Boukamp has pled not guilty to the charges against him (Dkt. No. 125) and, since the inception of this case, he has been evaluated by four psychologists—including a psychologist from the Federal Bureau of Prisons—and one psychiatrist.  Their evaluations and testimonies are summarized below.

### i.   Dr. Tyler Whitney

Dr. Tyler Whitney is a licensed clinical psychologist and has specialized training in communication and developmental disorders.  Def. Ex. 9 at 11–20.  On January 19, 2021, Dr. Whitney interviewed Boukamp's parents remotely for two hours as part of a neurodevelopmental evaluation of Boukamp.  *Id.* at 1–10.  Based on Boukamp's parent's representations, Dr. Whitney provisionally diagnosed Boukamp with Autism Spectrum Disorder (ASD) and Major Depression.  *Id.* at 8.  He stated that "Boukamp's recent alleged criminal behaviors are consistent with ASD traits such as: hyper focus (intense focus), not

recognizing social rules, and poor independent problem-solving / judgement, as well as not asking for help." *Id.* at 9–10.  But Dr. Whitney did not give any opinion as to Boukamp's competency to stand trial and did not testify at the competency hearing.

### ii.    Dr. Natalie Montfort and Dr. Michelle Garcia

Dr. Natalie Montfort and Dr. Michelle Garcia are licensed clinical psychologists specializing in Autism Spectrum Disorder.  Def. Ex. 4 at 1.  However, neither doctor is licensed as a forensic psychologist or formally trained to perform competency evaluations. *Id.* at 37–54; Tr. at 183–85, 206, 212–15.  Dr. Garcia has some forensic experience but has never performed a competency evaluation or given an opinion about competency to stand trial in a court setting.  Tr. at 214–15.

From June to July 2021, Dr. Montfort and Dr. Garcia completed a psychological evaluation of Boukamp that included seven and a half hours of psychological assessments with Boukamp over Zoom and three hours of interviews with his parents.  Def. Ex. 4 at 3. On August 5, they gave defense counsel a letter (Def. Ex. 2) summarizing the findings contained in their psychological evaluation report (Def. Ex. 4).  They diagnosed Boukamp with ASD, Major Depressive Disorder (MDD), and Post-Traumatic Stress Disorder (PTSD).  Def. Ex. 4 at 28.  After performing psychological tests, interviews, and examinations with Boukamp, they found:

> Boukamp's ability to understand social communication and to communicate with others was as developed as that of a 5- to 7-year-old child.  Despite his intact intellectual ability and his vocabulary, Mr. Boukamp lacks the ability to communicate effectively and understand the communication of others which limits his ability to take the perspective of others.  He demonstrates a persistently rigid style of thinking, deficits in executive functioning, difficulty with perspective taking, and differences in how he understands his environment and the thoughts, feelings, and behavior of those around him. . . .

>Boukamp has difficulty communicating with his legal team, difficulty
>listening to his legal team, an exaggerated view of his own level of legal
>knowledge, fixed and unchanging ideas, and idiosyncratic views about legal
>rules which preclude him from processing advice from his attorney, rationally
>testifying, and rationally making decisions.

Def. Ex. 2 at 1.  Based on these findings, Dr. Montfort and Garcia concluded that:

(1) Boukamp is clinically impaired in his appreciation of the nature and consequences of his

actions as well as the charges and proceedings against him; (2) "[h]e has limited capacity to

consider the advice of counsel, will likely be unable to stay on track when testifying, and . . .

is unable to assist properly in his case"; (3) he is "incompetent to make decisions, evaluate

options, and speak on his own behalf in complex legal proceedings, especially where he is

involved"; and (4) he "demonstrates legal incompetence."  Def. Ex. 4 at 28–30; Def. Ex. 2.

At the competency hearing, Dr. Montfort primarily testified about ASD in general.

*See* Tr. at 154–92.  She noted that ASD could interfere with someone's ability to make

decisions, among other things.  Tr. at 182.  But regarding competency to stand trial, she

advised that Dr. Garcia had performed the competency assessment described within their

report and that questions about competency would be better directed to Dr. Garcia.  *Id.* at

182–87.  When asked whether she could render an opinion on Boukamp's competency, she

responded that she could give "an opinion on someone's ability to think and take in

information and process information, which are relevant to competency," but not an

opinion on an "actual determination of competency."  *Id.* at 184.  Nevertheless, she opined

that Boukamp was incompetent to stand trial but, again, she denied being qualified to

render an expert opinion on the issue.  *Id.* at 185.

Dr. Garcia testified that she is "not qualified as a forensic psychologist" but has

"done things in the forensic realm."  *Id.* at 214.  She testified that she was able to "offer a

professional opinion" about Boukamp's competency based on her training, experience, and work with Boukamp. *Id.* at 212. Based on her experience, she performed the MacArthur Competency Assessment used to evaluate Boukamp's competency to stand trial. *Id.* But Dr. Garcia qualified that she performed the competency assessment as part of her assessment of Boukamp as a clinical psychologist. *Id.* Therefore, Drs. Garcia and Montfort "recommended a further competency evaluation" by a person with forensic training. *Id.* Dr. Kellaher filled that role.

Dr. Garcia testified that the MacArthur Competency Assessment she performed does not "have a decision-marking category." *Id.* at 210. But, nonetheless, she testified that Boukamp was "not able to process information quickly . . . to assimilate it" and render a decision—"especially in a pressured setting" like the competency hearing. *Id.* at 211. She opined that "[w]hile [Boukamp] might sound verbally sophisticated, [his] understanding [and] ability to conceptualize the information in a way to make decisions" in his best interests "and to assist his counsel in that [was] deficient." *Id.* at 213. But not long after Dr. Garcia indicated that Boukamp was a slow processor with decision-making problems, and during her cross-examination, Boukamp made a relevance objection. Tr. at 220–21. Boukamp also made a speculation objection earlier in the hearing. *Id.* at 23–24, 220–21.

As part of her competency assessment, Dr. Garcia concluded that Boukamp had "minimal or no impairment as to [Boukamp's] understanding of the nature and consequences of the charges" against him. Tr. at 215; Def. Ex. 4 at 28. She also indicated that Boukamp had a "mild impairment in reasoning" about the nature or consequences of the charges. Def. Ex. 4 at 28; Tr. at 215–16. What she "found clinically significant was his appreciation of the nature and consequences of the charges." Tr. at 216.

In the competency portion of the report, Dr. Garcia wrote that Boukamp "stated that a 15-to-30-year sentence would still be like life in prison, and therefore, he would not want to take that." Def. Ex. 4 at 28. At the hearing, the government informed Dr. Garcia that a 15- to 30-year plea offer had been given to Boukamp, and Dr. Garcia admitted that Boukamp factually knew that such a sentence—or even a life sentence—could result based on a conviction. Tr. at 215–17, 224. Nonetheless, Dr. Garcia stated that Boukamp did not "underst[and] the consequences" on a deeper level in terms of "the ramifications" incarceration entails. *Id.* at 216–17. She denied that that a 15- to 30-year sentence could rationally seem like a life sentence to a 21-year old. *Id.* at 218–19. When probed further, she persisted that Boukamp's knowledge of the nature and consequences of the charges against him was just "a regurgitation of information" without a more profound understanding. *Id.* at 219–20, 224–25.

### iii.   Dr. Lacie Biber

Dr. Lacie Biber is a licensed clinical psychologist who works as a forensic psychologist for the Federal Bureau of Prisons. Gov. Ex. 2; Tr. at 6. She is certified as a forensic examiner in two states[1] and has experience working with sex offenders and developmental disorders. Gov. Ex. 2 at 2; Tr. at 6–7. As of the date of the hearing, she had completed 32 competency evaluations at the BOP. Tr. at 8.

Dr. Biber conducted a competency evaluation of Boukamp at FMC Forth Worth from December 16, 2021 through January 28, 2022. Gov. Ex. 1 at 2. Fourteen of those days were spent quarantining Boukamp per COVID-19 protocol, and the remainder was

---

[1] Defense counsel suggested that Virginia, one of the two states, might not certify forensic examiners. Tr. at 31. But Dr. Biber confirmed that she passed the certification course and completed training to be put on a list of qualified forensic psychologists in Virginia. *Id.*

spent doing clinical interviews and tests with Boukamp. Tr. at 9–10. Dr. Biber completed her competency evaluation report on February 25, 2022. Gov. Ex. 1 at 2.

In her report, Dr. Biber noted that Drs. Montfort and Garcia diagnosed Boukamp with ASD, MDD, and PTSD. *Id.* at 11. She advised that Boukamp refused to complete a personality-assessment test, among others, so she was unable to independently diagnose that Boukamp had ASD. *Id.* at 13–14; Tr. at 10–12. Dr. Biber nonetheless confirmed that Boukamp's behavior seemed consistent with ASD but found "no indication of any clinically significant symptoms or changes in functioning that would render a current diagnosis" of MDD or PTSD. Gov. Ex. 1 at 18–19. Based on behavioral observations, interviews, and available materials—including Boukamp's jail calls and messages to Doe—Dr. Biber found Boukamp competent to stand trial:

> While Mr. Boukamp presents with characteristics previously diagnosed as Autism Spectrum Disorder, including rigid and inflexible thinking, there was no indication that he lacked the ability to rationally and factually understand his charges, or work with counsel. Through phone conversations and in statements in the psycholegal interview, he expressed an ability to take advice from others and consider alternative options, especially as it related to proceeding with counsel. Therefore, he appears able to understand the nature and consequences of the proceedings against him, and assist properly in his defense.

*Id.* at 19. Dr. Biber also noted that Boukamp is emotionally destabilized when he perceives that his legal team is not working in his best interest and that when he is "frustrated, he can become more rigid in his thinking, and less inclined to consider the viewpoint of others." *Id.* She suggested that counsel communicate frequently with Boukamp and make him "feel as though his opinions are heard." *Id.*

At the hearing, defense counsel asked Dr. Biber why she could not independently diagnose Boukamp with a mental condition based on her psycholegal interview and criteria

– 8 –

within the Diagnostic and Statistical Manual of Mental Disorders, and Dr. Biber responded

that this was because Boukamp refused to take any psychological tests. *See* Tr. at 32–47.

She credibly conceded that Boukamp's "grand sense of himself" and "insistence on sharing

his thinking"—including his belief that a federal court did not have jurisdiction over him—

could be consistent with someone who had delusional thoughts. *Id.* at 48–49. But she

testified that she did not find Boukamp to have Delusional Disorder. *Id.* at 26

       Defense counsel also probed Dr. Biber on why she did not discuss legal strategy with

Boukamp. Tr. at 72–94. Dr. Biber explained that it is "not general practice to . . . explore

in great depth what an individual's defense strategy is" as part of a competency evaluation.

*Id.* at 89–90. She advised that "practice guidelines for forensic psychology" suggested that

practitioners must be careful about discussing legal strategies with a defendant to avoid

potential prejudice—especially if the defense strategy is not known to the prosecution. *Id.* at

82. She conceded, however, that "keeping an open mind to see what defense strategy

counsel has" reflects "an ability to work with a person." Tr. at 75.

### iv.  Dr. Denise Kellaher

       Dr. Denise Kellaher is a certified general and forensic psychiatrist with experience as

a psychiatric expert witness and consultant. Def. Ex. 8 at 1–2. She has published several

articles on and has experience with individuals who suffer from ASD and sex offenders. *Id.*

at 3–5.

       Dr. Kellaher spent three hours with Boukamp over Zoom to evaluate him for

competency to stand trial. Tr. at 131. She completed her evaluation report on April 13,

2022. Def. Ex. 7. Based on her interview of Boukamp and psychological testing, she

diagnosed him with Delusional Disorder (DD) and ASD. *Id.* at 11. She found that he is

"not currently competent to stand trial as a result of a combination of his ASD and a delusional disorder." *Id.* at 14.  She noted that "[t]hough he may have a sufficient factual understanding of the courtroom, his erotomanic delusion involving the victim and his ASD related rigidness interferes with a sufficient level of rational understanding of the proceedings in particular." *Id.*  She also opined that "his present ability to consult with his attorneys with a reasonable degree of rational understanding appears precariously contingent upon if and how the attorneys will comply with how Mr. Boukamp wishes to conduct himself in the courtroom in the presence of the victim." *Id.*

At the hearing, Dr. Kellaher testified that autism "is a spectrum" disorder, meaning that that individuals with ASD can have high intellect but be lacking in social skills, adaptive functioning, and certain cognitive abilities.  Tr. at 106–08.  Based on her evaluation of Boukamp, she found that, "[t]hough he has some very good verbal abilities and . . . an excellent memory ability, he is a slow processor." *Id.* at 107.  She also found that Boukamp was "quite regressed" in terms of his social skills and emotional development.  *Id.* at 107–08.

When asked about her diagnosis of Delusional Disorder, she advised that this diagnosis was based on Boukamp's responses after she had probed him on his fixation with the victim.  *Id.* at 122–23.  She indicated that DD can remain undetected unless an examiner confronts the examinee with his fixed beliefs or disturbed thoughts.  *Id.* at 122.  She opined that Boukamp is deluded in his thinking that Doe loves him and that she is his soulmate.  *Id.* at 142–43.  When asked about the chat logs between Doe and Boukamp, she conceded they were "very flirtatious" and "sexual" but denied that Doe had a genuine love interest.  *Id.* at 143–44.  Dr. Kellaher testified that his delusions about the victim and mental disorders

– 10 –

caused Boukamp to have an irrational understanding of courtroom proceedings in three areas: (1) the consequences of taking a plea bargain as opposed to going to trial; (2) the risks of testifying for himself; and (3) his chances at trial before a jury.  *Id.* at 135–145.

## 2.    Legal Standard for Competency

The government bears the burden of proving the defendant is mentally competent to stand trial by a preponderance of the evidence.  *United States v. Hutson*, 821 F.2d 1015, 1018 (5th Cir. 1987).  "A defendant is competent to stand trial if he has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding [and if] he has a rational as well as factual understanding of the proceedings against him.'"  *Austin v. Davis*, 876 F.3d 757, 777 (5th Cir. 2017) (alteration in original) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).  "A district court can consider several factors in evaluating competency, including, but not limited to, its own observations of the defendant's demeanor and behavior; medical testimony; and the observations of other individuals that have interacted with the defendant."  *United States v. Porter*, 907 F.3d 374, 380 (5th Cir. 2018) (quoting *United States v. Simpson*, 645 F.3d 300, 306 (5th Cir. 2011)).

## 3.    Analysis

### A.    Decisional competency is not the touchstone of evaluating competence to stand trial.

As a preliminary matter, the Court must address defense counsel's contention regarding the role of decisional competency in evaluating competence to stand trial. Defense counsel relies on *Godinez* in which the Supreme Court addressed "whether the competency standard for pleading guilty or waiving the right to counsel is higher than the competency standard for standing trial."  *Godinez v. Moran*, 509 U.S. 389, 391 (1993).  The court held that it is not.  *Id.*  It explained its holding based in part on its observation that the

decisional import of pleading guilty was at least as weighty as that of choices that a defendant may have to make during a trial. *See id.* at 391, 397–400. Notably, the court never abrogated the *Dusky* competency standard but rather expressly affirmed that the standard applied to defendants who plead guilty as well as those who proceed to trial. *Id.* at 399. Justice Kennedy's concurrence—on which the defendant relies (*see* Dkt. No. 108-1 at 23, 28)—also affirmed the *Dusky* standard but emphasized the "reasonable degree of rational understanding" portion of the standard over the "ability to consult with [a] lawyer." *Id.* at 403–04 (quoting *Dusky*, 362 U.S. at 402). Like the majority, Justice Kennedy emphasized the importance of deciding to plead guilty, but nowhere did he mention an alteration of the *Dusky* standard.

In fact, the Supreme Court expressly affirmed the *Dusky* standard in *Edwards*, and that standard governs unaltered in the Fifth Circuit also. *Indiana v. Edwards*, 554 U.S. 164, 170 (2008); *Austin*, 876 F.3d at 777. To the extent that decision-making ability is subsumed within a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" or a "rational . . . understanding of the proceedings against him," such ability is but one datapoint in determining competence to stand trial and will be discussed below. *Dusky*, 362 U.S. at 402; *see infra* Section 3.C. But decisional competency is not the touchstone of evaluating competency. Rather, competency to stand trial consists of the defendant having (1) a rational and factual understanding of the proceedings against him, and (2) an ability to consult with his lawyer to a reasonable degree of rational understanding. *Dusky*, 362 U.S. at 402.

Having clarified the standard for competency, the Court pivots to weighing the testimony and evidence presented at the hearing as well as its observations of Boukamp.

– 12 –

B.     **Boukamp has a rational and factual understanding of the proceedings against him.**

i.     **All experts agree that Boukamp displays behavior consistent with Autism Spectrum Disorder but has a high degree of intellect and verbal ability.**

Dr. Whitney first provisionally diagnosed Boukamp with ASD and MDD based on a two-hour remote interview of his parents. Def. Ex. 9 at 1–2, 8. Dr. Whitney primarily relied on the Vineland Adaptive Behavior Scales—a semi-structured adaptive-functioning interview—to assess Boukamp's adaptive behavior skills based on his parents' representations. *Id.* at 2, 6. Dr. Whitney found that Boukamp had low adaptive-communication, daily-living, and socialization skills. *Id.* at 6. Dr. Whitney did not testify at the competency hearing, but his diagnosis of ASD was confirmed by Drs. Garcia, Montfort, and Kellaher, all of whom had an opportunity to examine Boukamp either remotely or in person. Def. Exs. 4 at 28; 7 at 11. Dr. Biber noted that Drs. Montfort and Garcia had diagnosed Boukamp with ASD but was unable to independently diagnose Boukamp with ASD because he refused to complete a personality-assessment test, among others. Gov. Ex. 1 at 11, 13–14; Tr. at 10–12. Dr. Biber nonetheless confirmed that Boukamp's observed behavior seemed consistent with ASD. Gov. Ex. 1 at 19. So all of the experts agree that Boukamp, at a minimum, displays behavior consistent with ASD.

At the hearing and in their reports, all testifying experts stated that Boukamp had a high degree of intellect and verbal ability. In her report, Dr. Biber noted that Boukamp was aware of his charges, possessed adequate factual information related to court proceedings, and "expressed knowledge of legal information beyond what is typically reported by defendants, including citing case law and procedural information for what occurs when an individual is rendered incompetent to proceed." Gov. Ex. 1 at 19. According to the

Wechsler Adult Intelligence Scale assessment administered by Drs. Montfort and Garcia, Boukamp had a Full Scale IQ score of 121, which falls in the 92nd percentile for his age group and in the superior range; a Verbal Comprehension Index score of 127, which falls in the 96th percentile and in the superior range; a Perceptual Reasoning Index score of 113, which falls in the 81st percentile and in the high average range; and a Working Memory Index score of 125, which falls in the 95th percentile and in the superior range. Def. Ex. 4 at 21–22. In their opinion letter, Drs. Montfort and Garcia noted Boukamp's "intact intellectual ability and his vocabulary." Def. Ex. 2 at 1. And at the hearing, both doctors noted Boukamp's memory, intellect, and ability to restate facts. Tr. at 177, 186, 217–18, 224. Likewise, Dr. Kellaher noted that, though she believes Boukamp to be a slow processor, he has a high level of intellect, verbal skills, memory, and academic functioning. Tr. at 107. At the hearing, Dr. Kellaher testified that autism "is a spectrum" disorder and that it is not uncommon to find the coincidence of high intellect and verbal ability with low social skills, adaptive functioning, and certain cognitive abilities, in individuals with ASD. Tr. at 106–08. So all of the experts agree that, despite his ASD, Boukamp has a high degree of intellect and verbal skills.

His intellect and verbal skills are also apparent from the numerous jail calls admitted into evidence. Gov. Exs. 10–20. One poignant example is when Boukamp is talking to his mother. Boukamp asks her to read him the federal witness-tampering statute (18 U.S.C. § 1512), and she does. Gov. Ex. 15 at 3:06–5:55. He asks, "Does it say persuade?" *Id.* at 5:57–59. Then, he tries to reason that "talking to someone"—probably Doe—would not fall within the provisions of the statute and rationalizes that he would not try to "alter" or "influence any testimony" by the witness. *Id.* at 7:29–8:00. This conversation demonstrates

that Boukamp has considerable analytical and verbal ability and that he can process information efficiently.

> ### ii.   All experts agree that Boukamp has a factual understanding of the nature and consequences of the proceedings against him.

Furthermore, all of the experts agree that Boukamp factually knows the charges against him, his plea options, and the nature and consequences of the proceedings against him.  As part of the Revised-Competency Assessment Instrument interview, Dr. Biber noted that Boukamp: (1) identified the 16 charges and allegations against him; (2) noted they were felonies; (3) stated that sexual contact with minors is a crime; (4) stated "that travel while committing an illegal act constituted a federal crime because of 'travel in interstate commerce'"; (5) noted that "the maximum penalty for one of his charges was 'life'"; (6) "said that possible conditions of probation could include restrictions on places an offender can go, people they can contact, and limited rights to privacy"; (7) identified three available plea options as "guilty, not guilty, [and] not guilty by reason of insanity" and provided "correct definitions and dispositions of the plea options"; (8) knew that guilt had to be proven beyond a reasonable doubt; and (9) "expressed awareness of the provisions of a plea agreement, including forfeit of the right to a trial."  Gov. Ex. 1 at 14–15; *see* Tr. at 13– 17.  Moreover, Dr. Biber noted that, though he had a negative view of the federal government and "expressed strong opinions about how a judicial system should work," Boukamp understood the different roles in a courtroom, including that of a judge and a jury, and "was able to differentiate the trier of fact between a bench trial and jury trial as the Judge and jury, respectively."  Gov. Ex. 1 at 15, 19; Tr. at 13–14.  She concluded that Boukamp "expressed knowledge of legal information beyond what is typically reported by defendants."  Gov. Ex. 1 at 19.

She added at the hearing that Boukamp named the charges and allegations against him, that he understood his plea options, that he would consider a plea of guilty if the terms were agreeable to him, but that he does not want to plead guilty so that he can reserve options for sentence reform.  Tr. at 13–16.  She also mentioned that Boukamp wanted to go back to state court and believed that he had a jurisdictional defense.  Tr. at 49, 61–62; Gov. Ex. 1 at 15–16.

Dr. Kellaher also noted that Boukamp understood the difference between a jury and a bench trial and that "he believed that he had a better chance of convincing a jury that he was not guilty of the charges."  Def. Ex. 7 at 6.  She noted that Boukamp "demonstrated an adequate levels [sic] of factual understanding of the courtroom and the proceedings" and that there was no impairment with his factual understanding of the proceedings against him.  *Id.* at 10; Tr. at 132–33.  The results from the MacArthur Competency Assessment[2] in Drs. Garcia and Montfort's report indicated that Boukamp had "minimal impairment in his understanding, mild impairment in reasoning, and clinical impairment in his appreciation of the nature and consequences of his charges."  Def. Ex. 4 at 28; Tr. at 187.  Dr. Garcia clarified in her testimony that "appreciation" of the charges was a concept much more profound than understanding the content of the charges and the potential sentences associated with each.  Tr. at 216–19.  This metric will be discussed below in Section 3.B.iii.b, but neither doctor contested that Boukamp understood the names, underlying acts, and potential sentences of the charges against him and his plea options.[3]

---

[2] At the hearing, Dr. Montfort noted that Dr. Garcia had completed the competency portion of their report.  Tr. at 183–87.

[3] Dr. Whitney had no opinion of Boukamp's understanding of the proceedings against him because Dr. Whitney did not interview Boukamp.  *See* Def. Ex. 9.

– 16 –

Thus, all of the experts agree that, at a minimum, Boukamp has an adequate factual understanding of the nature and consequences of the proceedings against him.  But this is where the defense experts and Dr. Biber diverge.

### iii.  Boukamp also has a rational understanding of the proceedings against him.

#### a.  His fixed beliefs about Doe or his chances at trial do not render his understanding of the proceedings irrational.

The defense experts contend that Boukamp lacks a rational understanding of the proceedings against him.  Based on the Evaluation of Competency to Stand Trial-Revised (ESCT-R) assessment, Dr. Kellaher concluded that "Boukamp evidenced an extreme impairment for rational understanding of the courtroom proceedings."  Def. Ex. 7 at 10. She noted "[h]is decision-making varied from immature and eccentric to illogical as it related to . . . testifying, pleading guilty, and dealing with [the] victim in [a] respectful manner."  *Id.*  She diagnosed Boukamp with Delusional Disorder based on his "enduring belief that the victim is in love with him" and was "meant to be his wife."  *Id.* at 11–12.  She opined that his fixed beliefs that Doe loved him and that a 30-minute conversation with Doe would cause all charges to be dropped clouded his ability to think rationally about his case and the grave decisions it involves.  Tr. at 118–19; Def. Ex. 7 at 6, 11–12, 14.

Indeed, Boukamp's fixed beliefs are confirmed by his jail calls.  Gov. Exs. 18 at 8:40– 9:40 (Boukamp suggesting that a 30-minute conversation would "solve" the case despite his father's disagreement); 20 at 15:10–14 ("I would have just married her.  I would have said you've got to marry me.  It's going to happen.").  And the other experts confirm that Boukamp has rigid thinking and beliefs.  Gov. Ex. 1 at 18; Def. Ex. 4 at 19.  But only Dr. Kellaher diagnosed him with Delusional Disorder based on these fixed beliefs.  Dr. Kellaher

advised that DD can remain undetected unless an examiner confronts the examinee with his fixed beliefs or disturbed thoughts.  Tr. at 122.  She suggested that she was able to diagnose Boukamp with DD because she discerned Boukamp's fixed beliefs about Doe after she probed him on his relationship with Doe.  *Id.* at 122–23.

The Court notes that Drs. Garcia and Montfort specifically considered Boukamp's thoughts about Doe in evaluating him but did not diagnose him with DD.  Def. Ex. 4 at 18–19, 28, 30.  When the government suggested that chat logs between Doe and Boukamp suggested there was a genuine love interest between them, Dr. Kellaher conceded the messages were "very flirtatious" and "sexual" but denied that Doe had a genuine love interest.  Tr. at 143–44.  Indeed, the chat logs contain flirtatious and sexually explicit content from Doe, which indicates that Boukamp's perspective may have been based on more than a modicum of reality—contrary to Dr. Kellaher's suggestion.  *See, e.g.*, Gov. Ex. 6.  Regardless of whether Boukamp has this mental condition or whether these views are based in fact, the relevant question is whether these fixed beliefs about the victim prevented Boukamp from having a rational understanding of the proceedings against him.

The term "rational understanding" appears twice in the *Dusky* standard—first in the understanding prong and second in the consultation prong.  But, to date, what a rational— as opposed to factual—understanding of the proceedings against a defendant has not been explicitly defined by courts.  The Supreme Court in *Drope* reaffirmed the *Dusky* standard but alternatively described the understanding component of competence as "the capacity to understand the nature and object of the proceedings against him."  *Drope v. Missouri*, 420 U.S. 162, 171 (1975).  *Drope*'s restatement of the understanding component seems to

collapse the distinction between rational understanding and a basic factual understanding of a criminal proceeding and the charges against the defendant.

Still, unless "rational" is to be rendered surplusage, the Court feels obliged to explore its possible contours.  In the context of competency to be executed, the Supreme Court has stated that "[a] prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it."  *Panetti v. Quarterman*, 551 U.S. 930, 933 (2007).  On remand, the Fifth Circuit cautioned district courts against equating rational understanding in *Dusky* with that in the Eighth Amendment context.  *Panetti v. Stephens*, 727 F.3d 398, 410 (5th Cir. 2013).  Still, the Fifth Circuit clarified that "*Dusky*'s inquiry into a defendant's 'rational understanding' of the charges against him is footed on the essentials of due process, probing whether a defendant 'has sufficient present ability to consult with his lawyer to assist in his defense.'"  *Id.* (quoting *Dusky*, 362 U.S. at 402).  And given that the *Dusky* standard explicitly links rational understanding with the ability to consult with an attorney, a rational understanding requires some degree of apprehension of the charges—beyond mere factual recitation of the charges and their potential sentences—such that a defendant is able to make considered choices based on the facts.

An ability to make considered choices concerning litigation strategy, however, does not mean that a defendant must make optimal choices.  The Fifth Circuit has held that an "understanding of the charges against him and the possible consequences, as well as an ability to make strategic choices and to communicate clearly" to a court is sufficient for a finding of a defendant's competence under the *Dusky* standard.  *Austin*, 876 F.3d at 780.  "[A]n ability to make strategic choices" does not mean a defendant must be able or even be likely to make choices that are favorable to him.  *See id.* ("The fact that a particular

– 19 –

defendant 'caus[es] his trial to be conducted in a manner most likely to result in a conviction' . . . however, is not sufficient for a finding of incompetency.") (quoting *Roberts v. Dretke*, 381 F.3d 491, 498 (5th Cir. 2004)).  Even where a defendant "displayed a pattern of bad decisions, as well as erratic behavior, inappropriate jocularity, and an indifferent attitude during the guilt and sentencing phases of his proceedings," the Fifth Circuit found that these facts were "not enough to raise a debatable issue that [the defendant] was incompetent to stand trial."  *Wilkins v. Stephens*, 560 F. App'x 299, 312 (5th Cir. 2014).  Thus, rational understanding does not mean that a defendant must choose the optimal strategy or decision that will benefit him in the proceedings; it does not mean that a defendant must be free from every misconception concerning his case or his chances at trial.  Rather, it means that a defendant must be able to perceive the risks and benefits associated with the choices set before him and to make a considered decision based on the facts.

Specifically, Dr. Kellaher identified that Boukamp had an irrational understanding of three things: (1) the consequences of taking a plea bargain as opposed to going to trial; (2) the risks of testifying for himself; and (3) his chances at trial before a jury.  Tr. at 135–145; Def. Ex. 7 at 6, 10, 14.  At the hearing, she opined that Boukamp's thoughts were irrational because: (1) he thought he would prevail at trial if he pleaded not guilty; (2) he did not understand that his testimony could hurt him; and (3) he believed that a male jury of his age group might benefit him.  Tr. at 135–145.

The Court disagrees.  First, Dr. Kellaher may believe that Boukamp may fare worse at trial than if he pleaded guilty, but that is her disagreement with Boukamp's choice on a matter that is constitutionally his alone to make.  *See* U.S. Const. amend. VI.  Misestimation of his outcomes at trial versus pleading guilty has nothing to do with Boukamp having a

basic understanding that pleading not guilty would result in a trial and that, if convicted, he may serve a sentence of incarceration.  There is ample evidence that he understands this.  *See* Section 3.B.ii.  Moreover, jail calls indicate that he understands that the government has an "open and shut case" against him.  Gov. Exs. 10 at 14:19–22; 16 at 5:06–27 ("They've already got what I believe is an open and shut case.  We barely have a defense because no one bothered to listen to me. . . .  I'm going in there with a f---ing toothpick; they have a broadsword.  I have no chance.").

Second, misappraising the risks of taking the stand and testifying at trial—despite a defense attorney's best efforts to dissuade a defendant from doing so—is a common mistake made by criminal defendants and does not render a defendant's understanding of the proceedings irrational.  In any case, Boukamp understands that testifying has risks and even knows that he has a right not to testify at trial.  Gov. Ex. 1 at 15; Tr. at 137.  Dr. Kellaher's own report states that Boukamp "expressed some worry about testifying" and "cited charges of perjury and contempt as possible risks of testifying."  Def. Ex. 7 at 6.

Third, a belief that a male jury of his age group might benefit him is entirely rational.[4]  It is common voir dire practice to select sympathetic jurors with similar views, backgrounds, and perspectives as those of the party a lawyer is representing.  While Boukamp may overestimate how favorable these male peers would be to his case, such estimation has nothing to do with his general understanding of the criminal proceeding against him.

---

[4] At the hearing, Dr. Kellaher denied that this belief is rational or commonsensical.  Tr. at 139–40.  The Court disagrees.  Her inexperience with criminal proceedings speaks for itself.

Moreover, the Court finds Dr. Biber's report and testimony to be highly credible, and they undermine Dr. Kellaher's opinion.  In her report, Dr. Biber said Boukamp "discussed hypothetical legal strategies, including why a defendant would choose to plead a certain way" and "reported that he was aware of the potential outcomes and [the] likelihood of said outcomes if he decided to take his case to trial."  Gov. Ex. 1 at 15.  "He stated that a plea agreement was offered by the prosecutor as an agreement for fewer charges in exchange for a guilty plea" and "expressed awareness of the provisions of a plea agreement."  *Id.*  At the hearing, Dr. Biber noted that Boukamp said he would consider a plea of guilty if the terms were agreeable to him.  Tr. at 15.  "When asked if he could accept advice from his attorney about whether or not to testify in a trial, he said, 'Maybe.  I think testifying is important.'"  Gov. Ex. 1 at 15.  Dr. Biber's observations militate against each of the three areas of irrational understanding that Dr. Kellaher identified.

At the hearing, Dr. Biber explained that it is "not general practice to . . . explore in great depth what an individual's defense strategy is" as part of a competency evaluation.  Tr. at 89–90.  She acknowledged that "Boukamp had a lot of ideas regarding how he would like to move forward with the case in certain areas" and noted his many disagreements and frustrations with his legal team.  *Id.* at 90.  Moreover, she credibly conceded that "keeping an open mind to see what defense strategy counsel has" reflects "an ability to work with a person."  *Id.* at 75.  But she explained that choices regarding defense strategy are up to the defendant and his defense team to "work through and, ultimately, the defendant's choice in how [he] wants to move forward."  *Id.* at 90.  She opined that Boukamp's disagreement with counsel does not "show a lack of factual or rational understanding of the proceedings

against him" or his apprehension of "the consequences that might be if he [took] a plea versus [going] to trial."  *Id.*

Therefore, Boukamp's fixed beliefs about Doe or his chances at trial do not render his understanding of the proceedings against him irrational.  To the contrary, Boukamp's understanding of criminal proceedings is rational and more developed than most defendants.[5]

### b.  Boukamp understands the charges against him as well as the potential consequences of a conviction and is able to make a considered decision based on the facts.

Boukamp clearly understands that he is charged with criminal offenses and that, if convicted, he could serve a lengthy term of imprisonment.  *See* Section 3.B.ii.  Drs. Garcia and Montfort also acknowledge that Boukamp knows as fact that he could serve time if convicted.  *See* Def. Ex. 4 at 28.  Their primary contention, however, is that Boukamp is clinically impaired in "his appreciation of the nature and consequence of his charges."  *Id.* Per the doctors, Boukamp "stated that a 15-to-30-year sentence would still be like life in prison, and therefore, he would not want to take that."  *Id.*  At the hearing, the government informed Dr. Garcia that a 15- to 30-year plea offer had been given to Boukamp, and she admitted that Boukamp factually knew that such a sentence—or even a life sentence—could result based on a conviction.  Tr. at 215–17, 224.  Nonetheless, Dr. Garcia stated that Boukamp did not "underst[and] the consequences" on a deeper level in terms of "the ramifications" it entails.  *Id.* at 216–17.  She denied that that a 15- to 30-year sentence could rationally seem like a life sentence to a 21-year old and incredibly persisted in her assertion

---

[5] This is also confirmed by the numerous, coherent motions that defendant has filed—without the assistance of counsel—after the Court allowed him to proceed pro se (Dkt. Nos. 125; 134).  *See, e.g.*, Dkt. Nos. 138; 142; 143; 167; 174; 181; 185–91.

that Boukamp did not have a rational understanding of the consequences of a conviction. *Id.* at 218–19. Clearly Dr. Garcia has a far more profound definition of "understanding" than that contemplated by the *Dusky* standard.

Contrary to Dr. Garcia's suggestions, a rational understanding of the consequences of a criminal proceeding is not so profound as to encompass a holistic, metaphysical, or epistemological understanding of every ramification that a conviction can have on a defendant's life. A rational understanding merely means that a defendant "understand[s] the nature and object of the proceedings against him" and is able to make a considered choice based on the facts. *Drope*, 420 U.S. at 171.

Boukamp understands that he is faced with federal felony charges on which the government bears the burden of proof in proving beyond a reasonable doubt that he committed the acts underlying the charges. He understands that he has a right to a trial by jury and that, if found guilty by verdict or plea, he could serve a significant sentence of imprisonment. *See* Section 3.B.ii. He knows that he would have a right to testify at trial but that doing so might result in adverse consequences. He understands the difference between a plea offer of a 15- to 30-year sentence versus a potentially longer sentence at trial and appreciates the strength of the government's case against him. Nonetheless, he believes that, with that much sentencing exposure, trial might be worth the risk. He thus perceives the risks and benefits of the choices set before him and is able to make a considered decision based on the facts. Nothing more is necessary in the Court's finding that Boukamp has a rational understanding of the proceedings against him.

**C.**    **Boukamp has sufficient present ability to consult with a lawyer with a reasonable degree of rational understanding.**

The Court has already found that Boukamp has a rational understanding of the proceedings against him and that he has a high degree of intellect and verbal ability. Thus, it is not necessary for the Court to revisit whether Boukamp has a reasonable degree of rational understanding of the proceedings against him or his ability to understand speech in general. However, given that the defense experts suggest that Boukamp's social functioning is so impaired such that he sometimes refuses consult with his attorneys unless they comply with his wishes, the Court must first clarify the other half of the *Dusky* standard: "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Dusky*, 362 U.S. at 402.

**i.**    **Ability to consult must not be conflated with willingness to consult.**

"It is worth emphasizing that the *Dusky* standard refers to the *ability* of a defendant to communicate with his attorneys, not his *willingness* to communicate with his attorney. Being able but unwilling to communicate with one's attorney does not make a defendant incompetent to stand trial." *United States v. Merriweather*, 921 F. Supp. 2d 1265, 1304 (N.D. Ala. 2013) (emphasis in original). Numerous federal courts affirm this understanding of the consultation prong of the *Dusky* standard.[6] Courts and lawyers deal with difficult and

---

[6] *See, e.g.*, *United States v. Vachon*, 869 F.2d 653, 655 (1st Cir. 1989) ("But, the legal question before the judge concerned not what he *did* do. It concerned what he was *able* to do. The district court found that he was unwilling to assist, not that he was '*unable*' to do so."); *United States v. Guerrero*, 279 F. App'x 29, 29–30 (2d Cir. 2008) (affirming the district court's finding that the defendant was "able, although apparently not willing, properly, to assist in his defense"); *Daniel v. Erdos*, No. 1:18-CV-1661, 2020 WL 2950287, at *8 n.7 (N.D. Ohio May 12, 2020) ("But this conflates willingness and ability; seeking to disqualify one's attorney does not necessarily demonstrate inability."), *report and recommendation adopted*, No. 1:18-CV-1661, 2020 WL 2934815 (N.D. Ohio June 3, 2020); *United States v. Deas*, No. 3:07-CR-73, 2008 WL 11348312, at *2 (D. Conn. Nov. 3, 2008) ("The ability to communicate with his attorney and assist in his defense must be distinguished from the willingness of a defendant to so communicate and assist.").

disruptive defendants all the time.  And defendants often choose to ignore their counsel's best advice and, at times, they refuse to speak with their attorney.  But "[a] defendant's decision to behave obstreporously [sic] and to ignore his lawyers' wishes . . . is not synonymous with an inability to consult with counsel with a reasonable degree of rational understanding.  Indeed there is no necessary relation between the two."  *United States v. Holmes*, 671 F. Supp. 120, 122 (D. Conn. 1987).

> **ii.    Boukamp's intransigence in communicating with counsel goes to his willingness—not ability—to consult with counsel.**

Based on the ESCT-R assessment, Dr. Kellaher found that Boukamp "showed a moderate impairment for rational ability to [consult] with [counsel]."  Def. Ex. 7 at 10; *but see* Tr. at 117 (citing only a "mild impairment").  She states that Boukamp's "rigid thinking about corruption in the justice system, lack of perspective-taking, and strong need to prove he is right even when it will have no positive bearing (if not detrimental) on the case outcome are specific barriers in consulting with counsel."  Def. Ex. 7 at 10.  And she concluded that Boukamp's "present ability to consult with his attorneys with a reasonable degree of rational understanding appears precariously contingent upon if and how the attorneys will comply with how Mr. Boukamp wishes to conduct himself in the courtroom in the presence of the victim."  *Id.* at 14.  Drs. Garcia and Montfort failed to comment much on Boukamp's ability to consult with counsel[7] and only generally confirmed that his low social-interaction skills and adaptiveness made communications between Boukamp and counsel difficult.  *See* Def. Ex. 4 at 23–30.

---

[7] In stark contrast to Boukamp's refusal to cooperate with the government's expert (Gov. Ex. 1 at 13–14; Tr. at 10–12), Dr. Garcia also testified that Boukamp was "forthcoming and cooperative" with her and Dr. Montfort during their evaluation.  Tr. at 225–26.

The defense experts indicate that Boukamp is a difficult client for an attorney to represent, but they do not establish that Boukamp is unable to communicate and consult with counsel. A closer examination of Drs. Kellaher's and Biber's reports indicate that Boukamp is simply unwilling sometimes, rather than unable at all times, to consult with his attorneys. Dr. Kellaher states that his ability to consult is "contingent upon if and how the attorneys will comply" with his wishes, which indicates that Boukamp is able to consult with his lawyers at least sometimes. Def. Ex. 7 at 14. Dr. Biber's report similarly confirms that Boukamp is "particularly destabilized emotionally when he does not believe that he has a legal team working in his best interest." Gov. Ex. 1 at 19. She further acknowledges that "[w]hen he is angry and frustrated, he can become more rigid in his thinking, and less inclined to consider the viewpoint of others, as he does not feel his opinions and desires are heard." *Id.* So both parties' experts agree that Boukamp has episodes of refusing to heed counsel's advice when he disagrees with it.

But a defendant's intransigence and refusal to adhere to counsel's advice does not mean the defendant cannot understand the advice and proceed to make a considered—but perhaps miscalculated—decision. Many clients—for reasons right or wrong—disagree with their attorneys and stubbornly persist in their view of the case. Boukamp clearly has some fixed ideas about legal strategy, the victim, and his prospects at trial that make him unwilling to adhere to his counsel's advice. However, these impressions tend to concern Boukamp's willingness rather than his ability to consult with counsel.

Dr. Kellaher noted that Boukamp's "decision-making varied from immature and eccentric to illogical as it related to . . . testifying, pleading guilty, and dealing with [the] victim in [a] respectful manner." Def. Ex. 7 at 10. The first two—testifying and pleading

guilty—are by law Boukamp's decision to make and not that of his attorneys.  Dr. Kellaher did not seem to understand the significance of this fact—perhaps because of her lack of familiarity with criminal proceedings—whereas Dr. Biber did.

Dr. Biber acknowledged that "keeping an open mind to see what defense strategy counsel has" reflects "an ability to work with a person."  Tr. at 75.  But she understood that such choices regarding defense strategy—including pleading guilty—are up to the defendant and his defense team to "work through and, ultimately, the defendant's choice in how [he] wants to move forward."  *Id.* at 90–91.  Dr. Biber noted that BOP forensic psychologists "often get referrals from defense attorneys that have a difficult time working with their defendants for one reason or another, and many times, the individual, in [their] opinion, does not appear to have an incompetence to proceed" with trial.  *Id.* at 91.  She opined that Boukamp's persistence in wanting to go to trial does "[n]ot necessarily" mean "that he cannot assist counsel in preparation of his defense."  *Id.*  Furthermore, based on her observations, "it did not appear" that Boukamp was absolutely "fixated on not taking a plea."  *Id.* at 92.  She relayed that Boukamp had "discussed that he would consider a plea agreement . . . if he could agree to the terms."  *Id.* at 15.

Boukamp comprehends the nature of the criminal proceedings against him, his plea options, the consequence of pleading guilty versus going to trial, and the risks of testifying.  *See supra* Section 3.B.  So he clearly has the ability to understand his attorneys' advice and the consequences of not heeding their advice.  His unwillingness to adhere to his lawyers' counsel on pleading guilty or testifying—despite understanding the potential consequences of each—does not render him incompetent to stand trial.  Furthermore, Boukamp's unwillingness to deal with the victim in a respectful manner is not related to his ability to

– 28 –

communicate with counsel and consider their advice.  Any disruption at trial arising from

Boukamp's unruly behavior if Doe testifies can be handled by the Court's trial procedures as

necessary.

The defense experts have not demonstrated that Boukamp is unable—rather than

occasionally unwilling—to consult with his counsel.

### iii.   Boukamp is very able to assist in his defense and even tried to do so during his competency hearing.

In inquiring into a defendant's ability to consult with a lawyer and to assist in his

defense, courts have considered many factors including:

> 1) the state of the defendant's memory, since he should be able to relate
> pertinent facts, names and events to his attorneys (although the defendant
> need not remember every fact that trial might encompass); 2) the extent to
> which relevant evidence could be reconstructed from communications made
> by the defendant to his counsel or from independent sources; 3) an adequate
> ability to review and evaluate documents and other written evidence bearing
> on the case; 4) an appreciation of the Government's evidence against him; 5)
> the ability to consider the wisdom of taking a course other than standing trial
> on the merits; 6) the ability to decide objectively whether to exercise his
> constitutional right to take the stand, and if he does take the stand, the ability
> to testify in an intelligent, coherent and relevant manner; 7) the ability to
> remain sufficiently alert and responsive so as to follow and recognize any
> discrepancies in the testimony of witnesses; and 8) the ability to discuss the
> testimony with his attorneys and to postulate questions to the witnesses
> through counsel.

*United States v. Madison*, No. 6:17-CR-15-ORL-37LRH, 2020 WL 8461574, at *34 (M.D.

Fla. Oct. 29, 2020) (collecting cases), *report and recommendation adopted*, No. 6:17-CR-15-

ORL-37LRH, 2020 WL 7768460 (M.D. Fla. Dec. 30, 2020).

There is no question that Boukamp has a very good memory, and all experts noted

his ability to recall facts.  *See supra* Section 3.B.i.  Neither party has represented that

Boukamp cannot relate the facts, names, and events underlying this case to his attorneys.

The Court observed Boukamp reviewing exhibits during the competency hearing and

following the expert witnesses' testimony.  Jail calls demonstrate that he fully appreciates the government's case against him.  Gov. Exs. 10 at 14:19–22; 16 at 5:06–27.  And the Court already explained that Boukamp has an adequate ability to understand the consequences of pleading guilty and taking the stand.

Finally, contrary to Dr. Kellaher's and Dr. Garcia's repeated and incredible assertions that Boukamp is a "slow processor" (Tr. at 106–07, 197, 211), Boukamp is "sufficiently alert and responsive so as to follow and recognize any discrepancies in the testimony of witnesses."  *Madison*, 2020 WL 8461574 at *34.  At the competency hearing, Boukamp raised two objections—for speculation and relevance—during witness testimony. Tr. at 23–24; 220.  After the relevance objection, the Court noted that Boukamp had given a "very quick response" to the government's cross-examination of Dr. Garcia on the fact that she had to leave her children with two babysitters and her disabled mother in order to testify.  Tr. at 221.  Although defense counsel suggested that Boukamp may have overheard this objection being suggested by one of his two attorneys (Tr. at 221), Boukamp clearly understands what a meritorious objection is.  The former speculation objection confirms this: Boukamp muttered a speculation objection when the government asked Dr. Biber whether she could have diagnosed him with other conditions had Boukamp completed a personality assessment.  Tr. at 23–24.  Thus, Boukamp was following the testimony of the witnesses so intently as to be able to discern potentially objectionable content.

All of this further solidifies the only reasonable conclusion—that Boukamp is highly capable of assisting counsel in his defense and possesses a sufficient present ability to consult with counsel with a reasonable degree of rational understanding.[8]

**4.     Conclusion**

Boukamp is clearly competent to stand trial: He has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him.  This case will proceed to trial.

So ordered on June 6, 2022.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE

---

[8] Boukamp's pro se filings since the competency hearing further support this finding.  His filings have been coherent and relevant, and they have adapted appropriately as the case proceeds.  *See, e.g.*, Dkt. Nos. 138; 142; 143; 167; 174; 181; 185–91.